**Cynthia SIMPSON, Plaintiff,**

v.

**CHESTERFIELD COUNTY BOARD OF SUPERVISORS, Defendant,**

**No. CIV.A. 3:02CV888.**

United States District Court,
E.D. Virginia,
Richmond Division.

Nov. 13, 2003.

Victor Michael Glasberg, Victor M. Glasberg & Associates, Alexandria, VA, Rebecca Kim Glenberg, Richmond, VA, Ayesha Khan, Washington, DC, for Plaintiff.

Stylian P. Parthemos, Steven Latham Micas, Chesterfield County Attorney's Office, Chesterfield, VA, for Defendant.

### MEMORANDUM OPINION

DOHNAL, United States Magistrate Judge.

This matter is before the court by consent of the parties (28 U.S.C. § 636(c)(1)) on cross motions for summary judgment. Fed.R.Civ.P. 56. The Plaintiff asserts, in her individual capacity, that the Chesterfield County Board of Supervisors' (the Board) established policy that restricts the giving of invocations at its public sessions to religious representatives of the Judeo–Christian tradition constitutes an impermissible preference for a certain set of beliefs over all others, including her own, in violation of the Establishment Clause of the First Amendment. (Compl.). Plaintiff also asserts that her rights to the free and equal exercise and expression of her religion have been violated by the Board under color of state law in violation of constitutional and statutory provisions. (Compl. ¶ 2; Pl.'s Mot. Summ. J.) (citing U.S. Const., amend. I, cl. 1; amend. XIV; 42 U.S.C. § 1983). The Board contends in defense, and in support of its reciprocal demand for dispositive relief, that the subject policy does not promote any particular religion; it does not constitute an unconstitutional entanglement of government and religion; Plaintiff's asserted First and Fourteenth Amendment rights to the full, free, and equal exercise and expression (free speech) of her professed religious beliefs have not been violated because no public forum is involved in which such rights would be implicated; and no one, including Plaintiff, is discriminated against on the basis of religion in the promulgation and/or application of the policy. (Def.'s

Mot. Summ. J.). For the reasons set forth herein, each motion for summary judgment is GRANTED in part and DENIED in part.

### Standard of Review

Summary judgment is only to be granted when there is no genuine dispute as to any issue of material fact when all justifiable inferences are drawn in favor of the non-moving party and the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, unsupported conclusory allegations by the non-moving party are not sufficient to create a genuine dispute of material fact so as to withstand the granting of relief. *Celotex Corp.*, 477 U.S. at 327, 106 S.Ct. 2548 (White, J., concurring). In essence, the court must decide if the evidence when viewed in the light most favorable to the non-moving party "presents a sufficient disagreement to require submission to the [factfinder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–252, 106 S.Ct. 2505.

### Undisputed Material Facts and Justifiable Inferences

The court deems the following to be the undisputed material facts and justifiable inferences on which the resolution of the pending motions is properly based:[1]

1. The Board is the governing legislative body of a state locality that acts under color of state law. (Compl.¶ 4).

2. The Board has maintained a policy since approximately 1984 whereby invocations are given at each regularly-scheduled public meeting of the Board. (Compl. ¶ 7; Def.'s Mem. ¶¶ 1, 4).

3. The stated policy provides that all invocations "must be non-sectarian with elements of the American civil religion and must not be used to proselytize or advance any one faith or belief or to disparage any other faith or belief." (Def.'s Mem. ex. A).

4. Only the identity of the congregations of monotheistic religions with an established presence in the local community served by the Board are eligible to be placed on a list from which the respective leader is invited on a "first-come first-serve" basis to offer an invocation. (Def.'s Mem., Blakley Aff. ¶¶ 32,34; exs. A–C).

5. The policy's requirement that invocations contain elements of the American civil religion has been consistently interpreted and applied by the Board to allow only representatives of the Judeo–Christian tradition (Protestant, Catholic, and Jewish religions) and, on one isolated occasion, the Islamic faith, to be invited to give invocations. (Def.'s Mem. ¶ 8).

6. There is no evidence that invocations have been utilized to proselytize or

---

1. In addition to the parties' statements of undisputed facts as set forth in their respective memoranda as required by Local Rule, the court also accepts as true all factual allegations in the Complaint not contested by the Defendant by affidavit or other evidentiary material. (Mem. Supp. of Pl.'s Mot. Summ. J. (Pl.'s Mem.) at 1–5); Mem. Supp. of Def.'s Mot. Summ. J. (Def.'s Mem.) at 21–22; *see* *also Reyes v. City of Lynchburg*, 300 F.3d 449, 460 (4th Cir.2002) (Michael, J., dissenting) ("For summary judgment purposes, '[a]llegations in a complaint, which are not contested by the moving party by affidavit or other evidentiary materials, are assumed true'") (quoting *Elbe v. Yankton Indep. Sch. Dist. No. 1*, 714 F.2d 848, 850 (8th Cir.1983)).

advance any religion other than by reference to the name and being of the Judeo–Christian divinity (God) and Jesus Christ in most of the invocations given. (Pl.'s Mem. ex. 3 (Miller dep.) at 44–45; ex. 4 (Humphrey dep.) at 84; ex. 6).

7. There is no allegation or evidence that representatives of any polytheistic or other non-monotheistic religion were invited to give invocations.

8. Although the Board's meetings at which the invocations are offered are opened to the public, no opportunity is provided during the invocation period for public comment or discourse; rather, a separate opportunity is allowed later in the Board's agenda "for citizens to address the Board of Supervisors on matters involving the services, policies and affairs of the County." (Def.'s Mem., Blakley Aff. ¶ 10).

9. Plaintiff is a member and leader in the religion known as "Wicca" or "witchcraft" that has an established membership base within the local community governed by the Board. (Pl.'s Mem. ex. 1, ¶¶ 2, 6–7).

10. The Wicca religion includes a broad array of religious beliefs, practices, and traditions of a polytheistic and pantheistic nature that focus on the change of seasons and other natural phenomena. (*Id.* at ¶ 2).

11. The Wicca religion is not monotheistic at least in the same consistent sense as are the faiths of the Judeo–Christian tradition. (*Id.* at ¶ 4).

12. Plaintiff was prepared to present a non-sectarian invocation espousing basic values consistent with general themes about "life, death, and creation, and about how to live a good and ethical life." (Compl. ¶ 19; Pl.'s Mem. ex. 1 (Simpson Decl.) ¶ 15; ex. 8d).

13. The Board denied Plaintiff's repeated requests to provide a non-sectarian invocation for the following stated reason: "Chesterfield's non-sectarian invocations are traditionally made to a divinity that is consistent with the Judeo–Christian tradition. Based upon our review of Wicca, it is neo-pagan and invokes polytheistic, pre-Christian deities. Accordingly, we cannot honor your request to be included on the list of religious leaders that are invited to provide invocations at the meetings of the Board of Supervisors." (Compl.¶ 11).

14. Plaintiff specifically requested the Board to change its policy so as to allow her to participate in offering invocations, but the Board declined to do so and specifically reaffirmed the existing policy in response to Plaintiff's requests. (Pl.'s Mem. ex. B, attached exs. C, D, E, F, and G).

15. There are recognized religions in America other than Wicca that are not considered to be "monotheistic" or of the "Judeo–Christian" tradition, including, for example, Afro–Caribbean religions (*e.g.*, Santeria, Vodou, and Rastafarianism), Buddhism, Hinduism, the various Native American traditions, Bah'i, Jainism, Sikhism, Shinto, Taoism, and Zoroastrianism. (Pl.'s Mem. ¶ 28 (citing attached exhibits)).

### Analysis

*Case or Controversy/Standing*

As a preliminary issue, the Defendant challenges the Plaintiff's ability to maintain the action on the grounds that the

Board's policy is unassailable in that it constitutes nothing less than "a proper distinction based on the American civil religion" as sanctioned by Supreme Court precedent. (Def.'s Mem. at 10–11). The Defendant also asserts that no "case or controversy" in which Plaintiff has standing has been presented because Plaintiff has not suffered any personal "injury" where she was never denied the right to practice her religion or to address the Board as an individual, tax-paying citizen or representative of her religion during its public comment segment. (Def.'s Mem. at 12–14).

◼ It is well-settled that in First Amendment claims in which no direct economic harm or injury is alleged, an individual establishes standing in a case or controversy if it can be demonstrated that the individual is "directly affected by the laws and practices against [which] their complaints are directed." *Sch. Abington Sch. Dist. v. Schempp*, 374 U.S. 203, 224 n. 9, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963).[2] In this regard, Plaintiff's exclusion from the challenged process, that is, not being eligible to give an invocation, is no less an actionable injury than that suffered by school children and their parents who, in *Schempp*, challenged a state law that required the Bible to be read during each school session. Similarly, the plaintiffs in *Saladin v. City of Milledgeville*, 812 F.2d 687 (11th Cir.1987) (quoting *Schempp* ), were deemed to have standing to challenge the use of the word "Christianity" on a city's official seal that was placed on unsolicited correspondence that they simply received in the mails. *See also ACLU v. Rabun County Chamber of Commerce, Inc.*, 698 F.2d 1098, 1107–1108 (11th Cir.

1983) (plaintiffs had standing to challenge placement of a cross in a public park that made them feel like second class citizens). Here, Defendant argues, in part, that Plaintiff has not suffered any injury, constitutional or otherwise, because she always had an opportunity to address whatever issues she wanted in the open portion of the Board's meeting. (Undisputed Facts and Justifiable Inferences (Findings) ¶ 8). However, it is her preclusion and exclusion from the invocation segment that, in effect, altered her behavior in the sense of foreclosing her affirmative desire to participate, a consequence of the challenged policy no less actionable than that in the case law noted. Accordingly, the Plaintiff has presented a case or controversy of constitutional dimension for which she has standing to pursue, subject to a determination that valid religious issues are implicated.

*Establishment Clause*

◼ The Establishment Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." U.S. Const., amend. I. The First Amendment is made applicable to the states by virtue of the due process clause of Fourteenth Amendment. *See Everson v. Bd. of Educ.*, 330 U.S. 1, 8, 67 S.Ct. 504, 91 L.Ed. 711 (1947) (applying Establishment Clause to states). First Amendment violations are also actionable against governmental entities by separate statutory authority where, as here, state "actors" are alleged to have caused the constitutional violation. 42 U.S.C. § 1983. The basic issue in this case concerns what is commonly referred to as "legislative

---

**2.** *See also Smith v. County of Albemarle*, 895 F.2d 953, 955 (4th Cir.1990) (finding that "recent authority" contradicted the Defendant's assertion that the Plaintiffs, who were taxpayers and county residents, had no standing to bring an Establishment Clause claim against the county challenging the erection of a nativity scene on the front lawn of the county office building absent personal economic injury).

prayer," that is, prayer authorized by a governing body that is typically intended to instill a sense of purpose and solemnity over its proceedings and actions or for other comparable motivational objectives. Legislative prayer is not unconstitutional, *per se:*

> In light of the unambiguous and unbroken history of more than 200 years, there can be no doubt that the practice of opening legislative sessions with prayer has become part of the fabric of our society. To invoke Divine guidance on a public body entrusted with making the laws is not, in these circumstances, an "establishment" of religion or a step toward establishment; it is simply a tolerable acknowledgment of beliefs widely held among the people of this country. As Justice Douglas observed, "[w]e are a religious people whose institutions presuppose a Supreme Being."

*Marsh v. Chambers,* 463 U.S. 783, 792, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983) (quoting *Zorach v. Clauson,* 343 U.S. 306, 313, 72 S.Ct. 679, 96 L.Ed. 954 (1952)).[3]

However, there are limitations, including the caveat that a governmental policy or practice providing for legislative prayer cannot be promulgated or maintained on the basis of impermissible motive. The concept of "impermissible motive" in the context of legislative prayer includes a prohibition against utilizing prayer to proselytize or advance any particular religion by sanctioning a preference for a particular set of beliefs as well as a prohibition against the disparagement of other faiths and beliefs. *Marsh,* 463 U.S. at 792–795,

103 S.Ct. 3330. The purpose for such a prohibition is, at a minimum, to preclude a governmental body from "establish[ing] a particular religion as the sanctioned or official religion of the legislative body." *Snyder v. Murray City Corp.,* 159 F.3d 1227, 1234 (10th Cir.1998).

■ The Plaintiff asserts that the basic issue of whether the Board's policy is violative of the Establishment Clause must be resolved by a strict scrutiny analysis where the question is simply whether the policy dictates by its own terms a preference for any particular religion to the exclusion of others.[4] *Larson v. Valente,* 456 U.S. 228, 244, 246, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982) ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another ... when we are presented with a state law granting a denominational preference, our precedents demand that we treat the law as suspect and we apply strict scrutiny in adjudging its constitutionality"); *see also Hernandez v. Comm'r,* 490 U.S. 680, 695, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989) ("[W]hen it is claimed that a denominational preference exists, the initial inquiry is whether the law facially differentiates among religions"); *Corp. of Presiding Bishop v. Amos,* 483 U.S. 327, 339, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987) ("[L]aws discriminating *among* religions are subject to strict scrutiny") (emphasis in original); *Koenick v. Felton,* 190 F.3d 259, 264 ("Strict scrutiny in the Establishment Clause context is to be used to evaluate only those statutes

---

3. "Legislative prayer" is to be distinguished from such other forms of prayer as "court prayer" and "school prayer" (at least on the primary and secondary school levels) that may be *per se* unconstitutional. *See, e.g., N. Carolina Civil Liberties Union Legal Found. v. Constangy,* 947 F.2d 1145 (4th Cir.1991); *Lee v. Weisman,* 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992).

4. There is no evidence (or assertion) that the policy has been utilized ("as applied") in a disparate fashion whereby, for example, religious representatives of other non-monotheistic religions have been permitted to offer invocations. (Findings ¶ 7).

that facially discriminate between religious denominations or between religion and non-religion") (citing *Hernandez* ). Under a strict scrutiny analysis, if a statute or, as here, governmental policy is determined on its face to be unconstitutional, it can only be salvaged by an affirmative showing that the challenged provision is tailored as narrowly as possible to serve a compelling governmental interest. *Larson*, 456 U.S. at 247–248, 102 S.Ct. 1673.

Initially, the Plaintiff urges that the Board's policy fails a strict scrutiny analysis where it mandates a broad, unjustifiable preference for a particular set of religious beliefs to the exclusion of all others that thereby violates the constitutional mandate of the Establishment Clause that prohibits the entanglement of religion and government. Plaintiff additionally argues that even if the policy survives a strict scrutiny analysis, it still violates the Establishment Clause under the three-part test in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971),[5] decided before *Marsh*, whereby a statutory proscription (including, the Plaintiff asserts, the policy here) is deemed violative of the Clause unless: "[f]irst, the statute [at issue] must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster 'an excessive government entanglement with religion.'" *Lemon.* 403 U.S. at 612–613, 91 S.Ct. 2105 (citations omitted); *Koenick*, 190 F.3d at 265. However, even if it is determined that the *Lemon* test is not the appropriate framework for analysis, Plaintiff asserts that the policy is still not saved by the alternative analysis set forth in *Marsh*, as contended

by the Defendant, because of the distinguishable circumstances involved in *Marsh*. (Pl.'s Mem. at 6).

The Defendant urges that the Supreme Court's decision in *Marsh* is dispositive in legitimizing its policy under the Establishment Clause whereby the practice of providing for an essentially benign solicitation for divine guidance consistent with the Judeo–Christian tradition is specifically sanctioned in *Marsh* and related precedent as nothing more than "simply a tolerable acknowledgment of beliefs widely held among the people of this country." (Def.'s Mem. at 5–10). The Defendant otherwise contends that the policy does not result in an unconstitutional entanglement of church and state because the random ("first-come, first-serve") invitation of voluntary, unpaid representatives of the Judeo–Christian religious community does not allow for the selective promotion of any particular religion. *Id.*

The policy here does not state a denominational preference among the monotheistic religions of the Judeo–Christian tradition. (Findings ¶ 3, 13). However, as clarified in the denial of Plaintiff's request, it specifies a preference between monotheistic religions of the Judeo–Christian tradition (as elements of what the stated policy refers to as the American civil religion) and polytheistic, pre-Christian, neo-pagan religions that the Defendant concluded included the Plaintiff's Wiccan beliefs. *Id.* The analysis could stop here, but for the possibility that the perceived preference may not be seen to be that clear and the judicial emphasis in case law (and by the parties) on the competing tests in *Lemon* or *Marsh* concerning issues involving legislative prayer and the resulting

---

**5.** The facts in *Lemon,* not relevant here, concerned challenges to separate state statutory schemes that provided public funding of salary incentives for parochial school teachers. The Court held both to be unconstitutional in

violation of the Establishment Clause because of the excessive entanglement of church and state that resulted in a direct benefit to the religious entities involved. 403 U.S. 602, 91 S.Ct. 2105.

potential for "entanglement" of government and religion.[6]

As to the applicability of the *Lemon* test, although the Defendant professes that the purpose of the policy is non-sectarian, the primary effect of prayer, by definition, custom, and/or usage, is "preeminently religious rather than secular," thereby at least suggesting that the first prong of the *Lemon* test cannot be satisfied under any analysis.[7] *Marsh*, 463 U.S. at 797, 103 S.Ct. 3330 (Brennan, J., dissenting); *see also Koenick*, 190 F.3d at 265 (explaining that *Lemon* "required that the state action possess a secular purpose"). Beyond that, the giving of a prayer can hardly be viewed as other than "the advancement of religion," at least in a general sense, even if the prayer itself is only a momentary, essentially benign event that could hardly be viewed as "an excessive entanglement between church and state." *Id.* Indeed, as noted by the court in *Mellen:*

> When a state-sponsored activity has an overtly religious character, courts have consistently rejected efforts to assert a secular purpose for that activity. In-

deed, we have emphasized that "an act so intrinsically religious as prayer cannot meet, or at least would have difficulty meeting, the secular purpose prong of the *Lemon* test." And we have also recognized the obvious, that recitation of a prayer "is undeniably religious and has, by its nature, both a religious purpose and effect."

*Mellen,* 327 F.3d at 373 (citations omitted). *See also Constangy,* 947 F.2d at 1150 (finding religious purpose in practice of opening court with prayer because it involved "an act so intrinsically religious as prayer"); *Hall v. Bradshaw,* 630 F.2d 1018, 1020 (4th Cir.1980) (finding religious purpose in the inclusion of a "Motorist's Prayer" on a state map because prayer is "by its very nature, religious").

However, the court in *Marsh* chose not to follow the *Lemon* test, instead holding that a statute or policy does *not* have to have a secular purpose to comply with the Establishment Clause and it does not constitute a prohibited entanglement in violation of the Establishment Clause for government to at least tolerate religion in a general way.[8] However, the *Marsh* prece-

---

6. Indeed, the Court of Appeals for this circuit has recently stated that "the *Lemon* test guides our analysis of Establishment Clause challenges." *Mellen v. Bunting,* 327 F.3d 355, 370 (4th Cir.2003) (citing *Koenick,* 190 F.3d at 264).

7. Furthermore, the court has additional concerns about whether the prayers offered throughout the time the challenged policy has been in effect were truly non-sectarian since of the thirty-eight prayers offered between June 2001 and April 2003, twenty-eight requested Jesus Christ's specific guidance (by name or implication), thereby indicating a strong preference for Christian beliefs and the conception of a deity. (Pl.'s Mem. ex. 6). It should also be noted that between January 2000 and December 2003, seventy-six individuals will have given invocations. Of those seventy-six, one was given by a Jewish Rabbi and two will have been given by a leader from the Islamic faith. Such numerical disparity casts further doubt on the Defendant's claim that the prayers that are offered actually satisfy the Board's own written policy requiring a non-sectarian invocation. (Def.'s Mem. ex. E). The court's analysis proceeds in any event, especially in light of the *Marsh* precedent.

8. It is also instructive, if not dispositive as to what test should apply, that the *Marsh* majority does not even refer to the *Lemon* analysis in its holding. The majority opinion in *Marsh* recites the history of the case that includes the court of appeals' reliance on *Lemon*, but it necessarily rejected its application to the issue of legislative prayer by reversing the lower court and adopting a separate rationale. *See Lynch v. Donnelly,* 465 U.S. 668, 679, 104 S.Ct. 1355, 79 L.Ed.2d 604 (explaining "[w]e did not, for example, consider that analysis [*Lemon*] relevant in *Marsh* ").

dent is distinguishable from this case, if not all others that do not involve what *Marsh* refers to as an established chaplaincy practice in which the selection process is based on the person who would present the prayer and not on what particular religious persuasion is represented. Indeed, in *Marsh* the Court held that the chamber's established chaplaincy practice that involved a particular minister who happened to be of a Judeo–Christian religion (Presbyterian),[9] did not violate the Establishment Clause because the body wanted that individual to perform the function and the practice of offering such legislative prayer "is deeply embedded in the history and tradition of this country" such that there is "no real threat to the Establishment Clause arising from a practice of prayer similar to that now challenged" where legislative prayer presents no more potential for establishment than the provision of school transportation ... beneficial grants for higher education ... or tax exemptions for religious organizations. *Id.* at 791, 103 S.Ct. 3330 (citing cases). The Court in *Marsh* noted and emphasized the historical record surrounding the nearly simultaneous adoption of the First Amendment and passage of legislation to authorize payment of a chaplain as clear evidence that such legislative prayer was not considered "as a proselytizing activity or as sym-

bolically placing the government's 'official seal of approval on one religious view.'" *Id.* at 792, 103 S.Ct. 3330 (citing cases).[10]

Lower courts, both state and federal, have struggled to interpret and apply *Marsh* in a consistent fashion, with mixed success.[11] In *Snyder,* for example, a local governing body had prohibited a proposed speaker from presenting a supposed prayer that would have denigrated the body's policy of having an opening prayer. 159 F.3d 1227. The Tenth Circuit, on rehearing *en banc,* found that "the mainline body of Establishment Clause case law [before and after *Marsh*] provides little guidance for our decision in this case" and held that a legislative body can exclude those who seek to disparage legislative prayer. The court concluded that equal and unlimited public access to a program of legislative invocational prayer is not required since the practice sanctioned by *Marsh* of selecting a particular representative of a religious genre "has become part of the fabric of our society" and such a practice necessarily involves the exclusion of others, including those who would disparage the practice. *Id.* at 1233 (quoting *Marsh,* 463 U.S. at 792, 103 S.Ct. 3330). The court specifically noted, however, that invocational prayer in a legislative context may be violative *if* the selection process

9. Although the Court in *Marsh* noted that guest chaplains were occasionally substituted to give the invocation, there is no indication that they were not of the same Judeo–Christian tradition and the circumstance of infrequent substitution does not appear to have been determinative in the Court's analysis in *Marsh* in any event. *Id.* at 793–794, 103 S.Ct. 3330.

10. Interestingly, there is support for the historical interpretation that the focus of the Founding Fathers in including the Establishment Clause in the First Amendment was to promote and protect diversity within Christianity by protecting the fledgling Methodist and Baptist faiths from the seemingly omni-

present Anglican influence, "but today they [the words of the Establishment Clause] are recognized as guaranteeing religious liberty and equality to the infidel, the atheist, or the adherent of a non-Christian faith ...." *Wallace v. Jaffree,* 472 U.S. 38, 52, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985).

11. Federal courts have also struggled with Supreme Court precedent regarding the Establishment Clause in the context of school prayer. *Mellen,* 327 F.3d at 370 ("[b]ecause the Court has applied a variety of tests (in various combinations) in school prayer cases, federal appellate courts have also followed an inconsistent approach").

"stemmed from an impermissible motive" that includes a preference where a particular religion is recognized "as the sanctioned or official religion of the legislative body." *Id.* at 1234 (citing *Marsh,* 463 U.S. at 793–795, 103 S.Ct. 3330).

On the state level, the California Court of Appeals in *Rubin v. City of Burbank,* 101 Cal.App.4th 1194, 124 Cal.Rptr.2d 867, 873 (2002), distinguished *Marsh* on the basis that the prayer that was being challenged contained "an explicit invocation of a particular religious belief" and "[b]y directing the prayer to 'Our father in heaven ... in the name of Jesus Christ' the invocation conveyed the message that the Burbank City Council was a Christian body, and from this it could be inferred that the council was advancing a religious belief."

Most recently in the Fourth Circuit, the Court of Appeals has addressed the issue involving the *Marsh* precedent in the context of state-supported college prayer. *Mellen,* 327 F.3d 355. In *Mellen,* the court distinguished *Marsh* on the basis that public universities and military colleges, including the college involved, did not "share" the same or comparable historical context as did the First Congress:[12]

> In upholding the Nebraska practice, Chief Justice Burger reasoned: "[t]his unique history leads us to accept the interpretation of the First Amendment draftsmen who saw no real threat to the Establishment Clause arising from a

practice of prayer similar to that now challenged."

The Supreme Court has since emphasized that *Marsh* is applicable only in narrow circumstances. In *County of Allegheny v. ACLU Greater Pittsburgh Chapter,* the Court recognized that the *Marsh* decision "relied specifically on the fact that Congress authorized legislative prayer at the same time that it produced the Bill of Rights." The Court expressly declined to interpret *Marsh* to mean that "all accepted practices 200 years old and their equivalents are constitutional today..." Likewise ... we emphasized, in invalidating a judge's practice of opening court with a prayer, that *Marsh* was "predicated on the particular historical circumstances presented in that case."

*Id.* at 369–370 (citations omitted).

The court in *Mellen* proceeded to identify what it referred to as the "endorsement test" whereby "the government may not engage in a practice that suggests to the reasonable, informed observer that it is endorsing religion." *Mellen,* 327 F.3d at 370 (citing cases).[13] The endorsement test, as noted by the court in *Mellen,* "was first articulated by Justice O'Connor in her concurrence in *Lynch,* and later adopted by a majority of the Court in *County of Allegheny.*" 327 F.3d at 378 (citations omitted). Both *Lynch* (1984) and *County of Allegheny* (1989) were decided after not only *Lemon* (1971), but also *Marsh* (1983),

**12.** The majority opinion in *Mellen* is by a divided panel that was upheld upon the denial of a petition for rehearing by an equally-divided *en banc* court. 341 F.3d 312.

**13.** The court also identified what it refers to as the "coercion test" by which "government may not coerce anyone to support or participate in religion or its exercise." *Id.* (quoting *Lee,* 505 U.S. at 587, 112 S.Ct. 2649). As the court confirmed in *Mellen,* such a test is a "prevailing consideration" in school prayer

cases where there is a "captured audience" as opposed to a legislative prayer scenario in which the prayer is directed to those (the legislators) who authorized the practice and who can as readily repeal it and which involves a voluntary listening audience who can simply absent themselves during the brief exercise or ignore its momentary impact. Accordingly, the "coercion test" is not an appropriate constitutional measure for analyzing the policy at issue here.

and although each case concerned facts not involving legislative prayer, they appear to articulate the most consistent standard for analysis in determining whether any governmental action, including that involved in legislative prayer, is premised on "impermissible motive." Under the endorsement test, the government may not convey or attempt to convey a message that religion or a particular religious belief is favored or preferred:

> Whether the key word is "endorsement," "favoritism," or "promotion," the essential principle remains the same. The Establishment Clause, *at the very least,* prohibits government from appearing to take a position on questions of religious belief or from "making adherence to a religion relevant in any way to a person's standing in the political community."

*County of Allegheny v. ACLU Greater Pittsburgh Chapter,* 492 U.S. 573, 593–594, 109 S.Ct. 3086, 106 L.Ed.2d 472 (quoting *Lynch,* 465 U.S. at 687, 104 S.Ct. 1355) (O'Connor, J., concurring)(emphasis added).

Matters of religion are inextricably intertwined with issues of government and vice versa. Religious references adorn our courtroom walls and hallways, our currency, and religious reference is included in our Pledge of Allegiance. As Chief Justice Burger noted in *Lynch,* within a year of having authored the majority opinion in *Marsh:*

> In every Establishment Clause case, we must reconcile the inescapable tension between the objective of preventing unnecessary intrusion to either the church or the state upon the other, and the reality that, as the Court has so often noted, total separation is not possible.

465 U.S. at 672, 104 S.Ct. 1355.

Yet, the Establishment Clause provides a limit:

> [T]his heritage of official discrimination against non-Christians has no place in the jurisprudence of the Establishment Clause. *Whatever else the Establishment Clause may mean ... it certainly means at the very least that government may not demonstrate a preference for one particular sect or creed (including a preference for Christianity over other religions).* "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another."

*County of Allegheny,* 492 U.S. at 604–605, 109 S.Ct. 3086 (quoting *Larson,* 456 U.S. at 244, 102 S.Ct. 1673) (emphasis added).[14]

In *Lynch,* a city's practice of displaying a creche during the Christmas holiday season depicting the traditional nativity scene was upheld on the basis that there was a valid secular purpose involved "to celebrate the Holiday and to depict the origins of that Holiday" without sufficient "evidence to establish that the inclusion of the creche is a purposeful or surreptitious effort to express some kind of subtle governmental advocacy of a particular religious message." *Id.* at 680, 104 S.Ct. 1355. In her concurring opinion, Justice O'Connor

**14.** Justice Scalia, who has taken issue with various aspects of the Court's majority interpretation of the Establishment Clause over time, has stated in reference to his own reasoning on the subject that: "As for the Establishment Clause justification [offered in a school prayer context], I would hold, simply and clearly, that giving nondiscriminatory access to school facilities cannot violate that provision *because it does not signify state or local embrace of a particular religious sect." Lamb's Chapel v. Center Moriches Union Free Sch. Dist.,* 508 U.S. 384, 400, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993) (Scalia, J. concurring) (emphasis added). Such reasoning at least suggests that Justice Scalia agrees that an established governmental preference for one set of religious beliefs over others is violative of the Establishment Clause.

sought to clarify the Court's Establishment Clause doctrine by noting that one of the principal ways in which government can run afoul of the Establishment Clause is by the government's endorsement or disapproval of religion:

> Endorsement sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community. Disapproval sends the opposite message.

*Id.* at 688, 104 S.Ct. 1355.

Justice O'Connor concluded that the holiday creche within a particular setting that also included purely secular symbols (such as Santa Claus and candy canes) did not constitute an endorsement of the Christian religion; rather, it was simply a celebration of a public holiday of cultural significance as expressed by traditional symbols that also had religious aspects. *Id.* at 691, 104 S.Ct. 1355.

A Christmas holiday creche was also the subject of challenge in *County of Allegheny,* along with a large (eighteen foot) Chanukah menorah and even larger (forty-five foot) Christmas tree. 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472. Unlike in *Lynch,* however, the Court (Justice Blackmun) held that the Latin caption over the creche, which translated meant "Glory to God in the Highest," constituted an unconstitutional endorsement or preference for the Christian religion in violation of the Establishment Clause because the patently Christian message glorified the birth of Jesus Christ and the placement of the display by itself in a prominent location inside a courthouse did not detract from the religious message being conveyed. At the same time, the Court upheld the constitutionality of the parallel display of the menorah and Christmas tree with a sign

saluting liberty because the combined symbols within a benign setting on a city/county government complex front lawn simply signified pluralism and freedom of belief in the celebration of the same winter holiday season.

Perhaps most significantly, the majority in *County of Allegheny* took occasion to specifically endorse Justice O'Connor's analytical framework in her concurring opinion in *Lynch* whereby any government endorsement, promotion, or preference of any particular faith is constitutionally prohibited. *Id.* at 595, 109 S.Ct. 3086. In addition, the majority also took note of Justice O'Connor's discussion of *Marsh* in her concurrence in *Lynch* in which she found that the legislative prayer in *Marsh, under those circumstances,*[15] did *not* constitute government endorsement of religion because it served the secular purpose of "solemnizing public occasions, expressing confidence in the future, and encouraging the recognition of what is worthy of appreciation in society." *County of Allegheny,* 492 U.S. at 595 n. 46, 109 S.Ct. 3086; *Lynch,* 465 U.S. at 691, 104 S.Ct. 1355. The majority opinion in *County of Allegheny* also adopted Justice O'Connor's "purpose and effect" approach first espoused in her concurring opinion in *Lynch* by holding that the effect of the creche under the facts of the case was an unconstitutional endorsement of religion by the promulgation of "a patently Christian message":

> [T]he government's use of religious symbolism is unconstitutional if it has the effect of endorsing religious beliefs, and the effect of the government's use of religious symbolism depends upon its context. These general principles are sound, and have been adopted by the Court in subsequent cases. Since

---

**15.** Which this court views as the selection of a particular individual to serve in an estab-

lished chaplaincy program without apparent regard to his particular faith.

*Lynch,* the Court has made clear that, when evaluating the effect of government conduct under the Establishment Clause, we must ascertain whether "the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices." 492 U.S. at 597, 109 S.Ct. 3086 (quoting *Grand Rapids v. Ball,* 473 U.S. 373, 390, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985)).

Although *Lynch* and *County of Allegheny* involved religious symbols, not words (prayer), and although the Supreme Court based its holdings in both cases on a *Lemon* analysis, the general principle that prohibits the endorsement or preference of one religious faith or group of beliefs over others to the extent that the "nonadherents" fairly perceive their exclusion as disapproval of their religious choice is relevant and controlling in this case. Here, the policy, on its face, permits only adherents of "the American civil religion" to participate in giving invocations and American civil religion has been interpreted and applied by the Board as referring *only* to the monotheistic faiths of the Judeo–Christian tradition.[16] (Findings ¶¶ 3, 5, 13). Whether the policy is viewed as being based on impermissible motive, having the effect of creating a religious preference, or simply being—as Chief Justice Burger opined in *Lynch*—an entanglement of government and religion that is unnecessary, the governmental policy at issue here that prohibits anyone holding a different set of religious beliefs—however different—or no religious beliefs at all, from participating cannot comply with the Establishment Clause not only under a strict scrutiny analysis, but any other analytical model:

> The Supreme Court has instructed us that for First Amendment purposes religion includes non-Christian faiths and those that do not profess belief in the Judeo–Christian God; indeed, it includes the lack of any faith.

*Glassroth v. Moore,* 335 F.3d 1282, 1294 (11th Cir., 2003) (citing *Allegheny County,* 492 U.S. at 590, 109 S.Ct. 3086); *Wallace,* 472 U.S. at 53, 105 S.Ct. 2479 (holding "the Court has unambiguously concluded that the individual freedom of conscience protected by the First Amendment embraces the right to select any religious faith or none at all"). Furthermore, the Defendant's argument that the Board's policy does not discriminate against any religion because religious representatives are invited on a "first-come, first-serve" basis is of no avail because those of non Judeo–Christian traditions are precluded from participating by the terms of the Board's policy.

In addition, even if under a strict scrutiny analysis the policy is seen as serving a compelling governmental interest by the solemnization of proceedings (or other laudable purpose), it is not tailored as narrowly as possible, as required, to achieve such purposes.[17] The policy, as enforced, has allowed, if not encouraged, the specific

---

**16.** On one isolated occasion in the record presented, the Board deviated from its policy to the extent of inviting a leader of the Muslim religion. However, though not of the Judeo–Christian tradition, Islam, as the Muslim religion, is monotheistic in the same sense that it includes the belief that Allah is the sole deity and that Muhammad is his prophet. *Merriam Webster's Collegiate Dictionary* 620 (10th ed.1998).

**17.** Although it appears unnecessary and/or inappropriate because of basic separation-of-powers principles for the court to determine what specific practice should be substituted in order to pass constitutional muster, such analysis is relevant in determining whether the policy is narrowly drawn so as to survive constitutional challenge and it seems disingenuous to simply say what cannot be done without at least suggesting what can, subject to legislative will.

mention of the Judeo–Christian deity as well as the name of Jesus Christ, references similar to those found violative in *County of Allegheny* and *Rubin,*[18] and it precludes the expression of common themes that would still serve the same public interest even though the speaker may be the representative of a religion outside that sanctioned by the policy. (Finding ¶ 12). In this regard, absent total abandonment of the practice of having any invocations or simply rotating the activity among the members of the Board itself in random fashion, one possible approach that demonstrates the policy is not narrowly tailored is that reference in the policy to the restriction that all invitees must be representatives of the American Civil religion in the Judeo–Christian tradition could simply be deleted. The sole qualification could then be substituted that the non-sectarian invocations to be presented must only serve, in Justice O'Connor's words, to solemnize the occasion by "expressing confidence in the future, and encouraging the recognition of what is worthy of appreciation in society," without being "used to proselytize or advance any one faith or belief" (as already stated in the policy) by reference to any specific deity or symbol (for instance, Jesus Christ), or to "disparage any other faith or belief."

The question remains whether Wicca must be considered to be a valid religion as a necessary basis for its adherents, including the Plaintiff, to invoke constitutional protection. The short and dispositive answer to the question is that whatever one may think of a group that calls its local chapter the Broom Riders Associa-

tion, Wicca has been recognized as a religion in this federal judicial circuit and elsewhere [19] on the basis that it "occupies a place in the lives of its members 'parallel to that filled by the orthodox belief in God' in religions more widely accepted in the United States." *Dettmer v. Landon,* 799 F.2d 929, 931 (4th Cir.1986) (quoting *United States v. Seeger,* 380 U.S. 163, 166, 85 S.Ct. 850, 13 L.Ed.2d 733 (1964)); (Pl.'s Mem. ¶ 26). Accordingly, where Wicca is recognized as a valid religion, the policy, in its present form, must be viewed as violative of the Establishment Clause because of its preference for certain other faiths.

### Free Speech/Free Exercise/Equal Protection

■ The Plaintiff also asserts additional constitutional claims that are appropriate to consider to at least insure comprehensive understanding and probable review. Reduced to simpler terms, Plaintiff claims that the policy denies her the constitutional right to express and exercise her religious beliefs as others are permitted to do. In this regard, the issue of whether she has been denied her full, free, and equal right to express and exercise her religious beliefs is subject to a unitary analysis. *Columbia Union College v. Clarke,* 159 F.3d 151, 155 n. 1 (4th Cir.1998) (citing cases) (requiring courts to consider the alleged denial of free speech, free exercise, and equal protection "as one constitutional inquiry").

The threshold inquiry is whether the speech involved is "private speech" or "government speech." If it is the latter, the First Amendment guarantees with re-

---

18. Recently, the district court in *Wynne v. Town of Great Falls,* No. 0:01–3409–22 (D.S.C. Aug. 21, 2003), held the practice whereby a member of a town council offered an opening and closing prayer in which the name of Jesus Christ was typically invoked to be violative of the Establishment Clause.

19. *See also U.S. Army Chaplains' Handbook: Excerpt on Wicca,* <http://www.religioustolerance.org/wic_usbk.htm> (last visited October 28, 2003).

spect to free expression and exercise of religion are not implicated:

> [T]here is a crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect.

*Bd. of Educ. v. Mergens,* 496 U.S. 226, 250, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) (emphasis in original).

If, on the other hand, the activity is viewed as private speech or any variation thereof, certain caveats apply, depending on the type of forum:

> Traditional public fora are defined by the objective characteristics of the property, such as whether, "by long tradition or by government fiat," the property has been "devoted to assembly and debate." The government can exclude a speaker from a traditional public forum "only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest."
>
> Designated public fora, in contrast, are created by purposeful governmental action.... If the government excludes a speaker who falls within the class to which a designated public forum is made generally available, its action is subject to strict scrutiny.
>
> Other government properties are either nonpublic fora or not fora at all. The government can restrict access to a nonpublic forum "as long as the restrictions are reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view."

*Arkansas Educ. Television Comm'n v. Forbes,* 523 U.S. 666, 677–678, 118 S.Ct. 1633, 140 L.Ed.2d 875 (citations omitted).

In order to determine the character of the "speech," it is necessary to identify both its purpose and effect. Here, the speech is the invocation itself that can— and must—be viewed separately from the balance of the Board's agenda that obviously includes varying and shifting forms of speech. The avowed purpose of the invocation is simply that of a brief pronouncement of simple values presumably intended to solemnize the occasion. (Findings ¶3). The invocation is not intended for the exchange of views or other public discourse. *Id.* Nor is it intended for the exercise of one's religion, at least in the sense of being recognized as a designated aspect of religious practice; rather it is utilized—at most—as an announcement of faith.[20] The context, and to a degree, the content of the invocation segment is governed by established guidelines by which the Board may regulate the content of what is or is not expressed when it "enlists private entities to convey its own message." *Rosenberger v. Rector,* 515 U.S. 819, 833, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995).[21]

---

**20.** While the Plaintiff is correct—contrary to the Defendant's assertions—that it is not necessary for Plaintiff to establish that she suffered a "substantial burden" on the exercise of her religion in order for strict scrutiny analysis to apply, it is nevertheless a relevant consideration in determining the nature of the speech. *Church of Lukumi Babalu Aye v. Hialeah,* 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). *See also Brown v. Borough of Mahaffey,* 35 F.3d 846, 849–850 (3rd Cir.1994) (citations omitted); *Columbia Union College,* 159 F.3d 151 (4th Cir.1998); *Te-*

*nafly Eruv Ass'n, Inc. v. Borough of Tenafly,* 309 F.3d 144 (3rd Cir.2002); *Davey v. Locke,* 299 F.3d 748 (9th Cir.2002); *Peter v. Wedl,* 155 F.3d 992 (8th Cir.1998).

**21.** Perhaps the real significance of the historical record in which the First Congress approved the hiring of a chaplain to open each session with an invocation within days of having approved the First Amendment is that the Founding Fathers did not view such activity as private speech subject to all First Amendment strictures.

As to the effect and/or impact of the invocations demonstrated by a sample review of those that have been offered, they are but brief, benign pronouncements of simple values that are not controversial nor confrontational but for, at most, mention of specific Judeo–Christian references that are nevertheless clearly recognized as symbols of the universal values intended to be conveyed. (Pl.'s Mem. ex. 6). It is also noted that there is a separate and distinct opportunity on the Board's agenda for public discussion and comment that is more clearly that of a forum for public discourse. (Findings ¶ 8). Given all of these characteristics and circumstances, the subject speech here "sounds" more than anything else like the government speech at issue in the student initiated pre-football game invocations held by the Supreme Court in *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000), *not* to be private speech and thereby subject only to the proscriptions of the Establishment Clause:

It reminds us that "there is a crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." We certainly agree with that distinction, but are not persuaded that the pregame invocations should be regarded as "private speech." These invocations

are authorized by a government policy and take place on government property at government-sponsored school-related events.... The Santa Fe school officials simply do not "evince either 'by policy or by practice,' any intent to open the [pregame ceremony] to 'indiscriminate use,' ... by the student body generally." Rather, the school allows only one student ... to give the invocation. The statement or invocation, moreover, is subject to particular regulations that confine the content and topic of the student's message.[22]

*Id.* at 302, 120 S.Ct. 2266 (emphasis in original).

At the same time, and in the alternative, *if* the invocation could be viewed as private speech, a so-called forum analysis must be employed to analyze the issues involved where, as our circuit court has recently reaffirmed, "forum analysis [is] the means of analyzing restrictions placed on private speech that occurs on government property." *Goulart v. Meadows*, 345 F.3d 239, 248 (4th Cir.2003) (citing cases).[23] If the invocation constitutes any type of forum, it must be viewed as a limited public forum to which a specified class of speaker is invited or permitted for a specific purpose and where it is clearly not the open forum designated by habit, custom, or otherwise for unrestricted public discourse, such as the proverbial street corner.[24] In the limited public forum, a certain degree of gov-

**22.** The court cannot conceive of a scenario involving the same aspects of the present situation involving controlled speech without the option for discourse or debate that could realistically be viewed as private speech subject to the personal First Amendment protections of free, full and equal expression and exercise of one's beliefs.

**23.** A forum, by definition, may be a place, as in a public meeting place for open discussion, or a thing, as in a medium where open discussion is involved in both and each involves private speech. For example, the Supreme Court in *Rosenberger*, 515 U.S. at 830, 115 S.Ct. 2510, pointed out that the forum in that

case was "a forum more in a metaphysical than in a spatial or geographic sense, but the same principles are applicable." In *Forbes*, the Court also recently had to determine if a particular debate was a limited public forum or a nonpublic forum so that the correct standards could be applied. 523 U.S. 666, 118 S.Ct. 1633, 140 L.Ed.2d 875.

**24.** In *Santa Fe Indep. Sch. Dist.*, the Court specifically addressed the limited question of whether a policy permitting student-led, student-initiated prayer at football games violated the Establishment Clause of the First Amendment. 530 U.S. at 301, 120 S.Ct. 2266. However, its discussion of what consti-

ernmental discretion is permitted, but subject to constitutional restrictions. The core restriction is that the designation of the class of speakers must be viewpoint neutral and those of "similar character" to the designated class cannot be excluded:

When a particular forum is classified as a designated/limited public forum, "[t]wo levels of First Amendment analysis" apply: the "internal standard" and the "external standard." *Id.* at 193–94. The "internal standard" applies to situations where " 'the government excludes a speaker who falls within the class to which a designated [limited] public forum is made generally available.' " *Id.* at 193 (quoting *Forbes,* 523 U.S. at 677, 118 S.Ct. 1633) (alteration in *Warren).* In this situation, the government's " 'action is subject to strict scrutiny.' " *Id.* at 193 (quoting *Forbes,* 523 U.S. at 677, 118 S.Ct. 1633). In other words, "as regards the class for which the forum has been designated, a limited public forum is treated as a traditional public forum." *Id.* On the other hand, the "external standard" "places restrictions on the government's ability to designate the class for whose especial benefit the forum has been opened." *Id.* at 194. We explained that "once a limited forum has been created, entities of a 'similar character' to those allowed access may not be excluded." *Id.* at 194 (citing, *inter alia, Perry,* 460 U.S. at 48, 103 S.Ct. 948). The government's designation of the class for the "external standard" is "subject only to the standards applicable to restrictions on speakers in a nonpublic forum," namely that "the selection of a class by the government must only be viewpoint neutral and reasonable in light of the objective purposes served by the forum." *Id.*

*Id.* at 250.

The initial inquiry, therefore, is what is the "class" of speakers invited to participate in the invocations in this case? The constitutionality of the class definition is determined by the reasonableness of the restrictions the government may place on access to the limited public forum in light of the purpose of the forum:

The government's decision to restrict access to a limited public forum "need only be *reasonable;* it need not be the most reasonable or the only reasonable limitation." *Cornelius,* 473 U.S. at 808, 105 S.Ct. 3439 (emphasis in original). Reasonableness in this context is assessed "in light of the purpose of the forum and all the surrounding circumstances." *Id.* at 809, 105 S.Ct. 3439. In other words, "[c]onsideration of a forum's special attributes is relevant to the constitutionality of a regulation since the significance of the governmental interest must be assessed in the light of the characteristic nature and function of the particular forum involved." *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.,* 452 U.S. 640, 650–51, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981).

*Id.* at 255.

On the one hand, the class in this controversy could be defined, as the policy

tutes a public or private forum for First Amendment purposes generally is still relevant for purposes of any analysis regarding the balance of First Amendment issues. *Id.* at 303, 120 S.Ct. 2266 ("As we concluded in *Perry,* 'selective access does not transform government property into a public forum.' ")(citing *Perry Ed. Ass'n v. Perry Local Educators' Ass'n,*460 U.S. 37, 47, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983)). Yet another

term sometimes used is "designated public forum" that refers to a forum opened only to a limited class of speakers or for limited purposes. However, the Fourth Circuit has held that the term and concept it represents is coterminous with a limited public forum. *Goulart,* 345 F.3d at 250 (citing *Warren v. Fairfax County,* 196 F.3d 186 (4th Cir.1999) (*en banc* )).

provides, to be those religious representatives of the American civil religion who only espouse the values of the Judeo–Christian tradition. On the other hand, if the class is defined as simply those who are prepared to espouse basic values by the medium of prayer, which is not confined or defined by a particular religious bent, then the class may be fairly viewed as encompassing the leaders of at least all recognized religions.[25] As to the former basis of class identification, it cannot be realistically asserted that the class can be defined by discriminatory/exclusionary terms and/or conditions where, by doing so, any class could be so restricted as to render the requisite forum analysis meaningless. The purpose of the invocations can be seen objectively as the solemnization of the occasion through the medium of prayer. Prayer is not unique to any particular religion; if anything, it is typical of all valid religions and therefore the purpose of "the forum" can be attained (and maintained) without reference to a specific religious heritage and/or its references such that any exclusionary restriction based on religious viewpoint cannot be deemed to be reasonable—or constitutional.

Accordingly, if the class of speakers here is simply made up of those who would espouse basic themes consistent with, for example, that articulated by Justice O'Connor ("expressing confidence in the future, and encouraging the recognition of what is worthy of appreciation in society"), then the Plaintiff, who is a representative of a recognized religion who stood ready to present an invocation consistent with such a theme, cannot not be excluded from participation in the limited/designated public forum because such action violates her First and Fourteenth Amendment rights of equal and free expression and free exercise of her religious beliefs. Therefore, either the policy is violative of the Establishment Clause and the invocation is government speech to which the remaining proscriptions of the First Amendment do not apply, or the invocation segment constitutes a limited or designated public forum in which the Board's policy is also violative of the Plaintiff's First and Fourteenth Amendment rights to the free, full, and equal exercise and expression of her religious beliefs because of its lack of viewpoint neutrality.

## CONCLUSION

Religion has united—and divided—the human condition over the ages. Our government has struggled to find an acceptable accommodation of the common interests of religion and government that are inextricably intertwined. The relationship is most dramatically demonstrated by examples such as every congressional session—from the earliest sessions—beginning with prayer, the specific invocation of the Christian deity on our currency ("In God We Trust"), and the solicitation of the same divine countenance in our Pledge of Allegiance ("... one nation, under God ...")[26]

■ The courts have struggled with a body of case law that is most charitably described as mercurial. Indeed, within the recent past, no less than the chief justice of a state supreme court has defied federal judicial authority by refusing to

25. Where religion is broadly defined as a belief or set of beliefs that "occupies a place in the lives of its members 'parallel to that filled by the orthodox belief in God' in religions more widely accepted in the United States." *Dettmer*, 799 F.2d at 931.

26. The constitutionality of which is presently under challenge before the Supreme Court. *Elk Grove Unified Sch. Dist. v. Newdow*, —— U.S. ——, 124 S.Ct. 384, —— L.Ed.2d ——, 2003 WL 21134177 (2003).

obey a court directive to remove from a court facility no less an overtly religious symbol than a monument honoring the Ten Commandments. *Glassroth v. Moore,* 242 F.Supp.2d 1067 (M.D.Ala.2002). Nevertheless, a central theme appears to this court to have arisen out of the morass. If the Establishment Clause means anything, it means that government is not to demonstrate any preference for one set of religious beliefs over another, or for that matter, over the lack of any religious belief. In addition, although a content-controlled governmental program format that does not allow for discourse or debate is not considered by at least this court as a forum subject to the remaining strictures of the First Amendment, *if* government establishes a forum to which it invites a class of speakers for a specific purpose, it cannot exclude some class members because of a difference in viewpoint. Here, Plaintiff is a representative of an acknowledged, albeit minority religion. Nevertheless, she stood prepared to offer an invocation consistent with the only guidelines government could constitutionally command under the circumstances. She was presumptively excluded because of a stated governmental preference for a different set of religious beliefs and viewpoint, albeit the beliefs of a large segment—if not the majority—of the population. Such a policy of exclusion cannot survive constitutional scrutiny.

It is therefore ORDERED that the Plaintiff's Motion for Summary Judgment is GRANTED in part and DENIED in part. It is GRANTED to the extent that the subject policy of the Defendant is found to be in violation of the Establishment Clause of the First Amendment. The Plaintiff's motion is DENIED in all other respects. It is further

ORDERED that the Defendant's Motion for Summary Judgment is likewise GRANTED in part and DENIED in part.

It is GRANTED only insofar as the Plaintiff's claims of constitutional violation on other than the basis of the Establishment Clause are herein denied. The Defendant's motion is DENIED in all other respects.

It is so ORDERED.