PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

CYNTHIA SIMPSON,
                        *Plaintiff-Appellee,*

v.

CHESTERFIELD COUNTY BOARD OF
SUPERVISORS,
                        *Defendant-Appellant.*

⎱  No. 04-1045

NATIONAL LEGAL FOUNDATION,
        *Amicus Supporting Appellant.*

CYNTHIA SIMPSON,
                        *Plaintiff-Appellant,*

v.

CHESTERFIELD COUNTY BOARD OF
SUPERVISORS,
                        *Defendant-Appellee.*

⎱  No. 04-1141

NATIONAL LEGAL FOUNDATION,
        *Amicus Supporting Appellee.*

Appeals from the United States District Court
for the Eastern District of Virginia, at Richmond.
Dennis W. Dohnal, Magistrate Judge.
(CA-02-888-03)

Argued: February 3, 2005

Decided: April 14, 2005

Before WILKINSON, NIEMEYER, and WILLIAMS,
Circuit Judges.

---

Affirmed in part, reversed in part, and remanded with directions by
published opinion. Judge Wilkinson wrote the opinion, in which
Judge Niemeyer and Judge Williams joined. Judge Niemeyer wrote
a concurring opinion.

---

## COUNSEL

**ARGUED:** Steven Latham Micas, COUNTY ATTORNEY'S
OFFICE FOR THE COUNTY OF CHESTERFIELD, Chesterfield,
Virginia, for Chesterfield County Board of Supervisors. Rebecca Kim
Glenberg, AMERICAN CIVIL LIBERTIES UNION FOUNDATION
OF VIRGINIA, Richmond, Virginia, for Cynthia Simpson. **ON
BRIEF:** Jeffrey L. Mincks, Stylian P. Parthemos, COUNTY
ATTORNEY'S OFFICE FOR THE COUNTY OF CHESTERFIELD,
Chesterfield, Virginia, for Chesterfield County Board of Supervisors.
Victor M. Glasberg, Kelly M. Baldrate, VICTOR M. GLASBERG &
ASSOCIATES, Alexandria, Virginia; Ayesha Khan, AMERICANS
UNITED FOR SEPARATION OF CHURCH & STATE, Washing-
ton, D.C., for Cynthia Simpson. Steven W. Fitschen, THE
NATIONAL LEGAL FOUNDATION, Virginia Beach, Virginia, for
Amicus Supporting Chesterfield County Board of Supervisors.

---

## OPINION

WILKINSON, Circuit Judge:

   In this case we consider the effect of the Establishment Clause on
a local government's policy concerning legislative invocations.
Because that policy does not "proselytize or advance any one, or [ ]
disparage any other, faith or belief," *Marsh v. Chambers*, 463 U.S.
783, 794-95 (1983), we believe it fits within the Supreme Court's

requirements for legislative prayer. We therefore remand the case with directions that the district court dismiss the complaint.

## I.

## A.

Chesterfield County, Virginia, a suburban jurisdiction south of Richmond, has a population of approximately 280,000. The County is governed by a Board of Supervisors composed of five elected representatives. The Board of Supervisors — like the United States Congress and many state and local legislative bodies — has adopted a policy under which its public meetings include a non-sectarian invocation. It instituted this practice in 1984, immediately after the Supreme Court upheld legislative invocations under the First Amendment's Establishment Clause. *See Marsh v. Chambers*, 463 U.S. 783 (1983). The County's policy, tracking the language of *Marsh*, states that each "invocation must be non-sectarian with elements of the American civil religion and must not be used to proselytize or advance any one faith or belief or to disparage any other faith or belief."

On days when it meets, the Board conducts some business in the afternoon, breaking for dinner at about 5:00. The evening session, which begins at 7:00, includes most of the substantive work requiring public hearings, and also provides an opportunity for citizens to address the Board. The Board begins this evening session with a "non-sectarian invocation" and the pledge of allegiance.

Instead of choosing a single chaplain to provide the invocations, the Board invites religious leaders from congregations within Chesterfield County. The Board's clerk maintains a record of such congregations, with addresses taken primarily from the phone book. Each December, the clerk sends an invitation to these congregations, addressed to the "religious leader." Sending these letters is designed to foster widespread participation throughout the County and to facilitate planning. Those who reply are scheduled to give the invocation on a first-come, first-serve basis.

The 2003 list maintained by the clerk includes 235 congregations. The bulk of them, but by no means all, are traditional Christian churches. The Islamic Center of Virginia is in Chesterfield County, and it is on the list. Imams associated with the Center have been involved in giving invocations, including at a Board meeting shortly after September 11, 2001. A Spanish-speaking Protestant church is on the list too; the invocation on July 25, 2001, given by a minister of that church, was split between Spanish and English. Several Jewish congregations appear on the list, and a rabbi gave an invocation before the Board. Roman Catholic and mainline Protestant churches are well represented, but the list also includes Jehovah's Witness congregations, a number of Mormon churches, and many independent churches.

This diversity reflects the Board's requirement that prayers be "non-sectarian." The magistrate judge noted that this principle was generally satisfied: "As to the effect and/or impact of the invocations . . . , they are but brief, benign pronouncements of simple values that are not controversial nor confrontational but for, at most, mention of specific Judeo-Christian references that are nevertheless clearly recognized as symbols of the universal values intended to be conveyed." *Simpson v. Chesterfield County Bd. of Supervisors*, 292 F. Supp. 2d 805, 820 (E.D. Va. 2003). The County, seeking to avoid the slightest hint of sectarianism, revised its invitation letter to the clergy. The letter now directs clerics to avoid invoking the name of Jesus Christ, a custom to which Christian clergy often had adhered when closing their invocations in the past.[1]

B.

Cynthia Simpson, a resident of Chesterfield County, contacted the clerk of the County Board in August 2002 seeking to be added to the list of religious leaders available to give an invocation.[2] Asked of

---

[1]That this policy was changed subsequent to litigation is not significant. Precisely the same policy revision was noted in *Marsh* itself, where the complaint was dated December 1979 but the chaplain "removed all references to Christ" in 1980. *Marsh*, 463 U.S. at 793 n.14.

[2]The County argues that Simpson lacks standing to bring this suit. She has never been denied the opportunity to address the County Board or to

which religion she was a leader, Simpson "told [the deputy clerk] that [she] was a witch." Simpson stated in her deposition that there was no difference between the words "Wicca" and "witchcraft," but that "I prefer the words witchcraft and witch myself, but that's a personal preference." She belongs to the Reclaiming Tradition of Wicca, and is a member of a local group known as the Broom Riders Association. Simpson claims eligibility to lead an invocation because she is a "spiritual leader" who frequently takes a leadership position in conducting the rites and worship for her group. Simpson identified herself as "a monotheistic witch" who "believe[s] in the goddess," in a pantheistic sense. Although she acknowledged that in the course of her worship gods and goddesses such as Kore, Diana, Hecate, and Pan had been invoked, she explained that, to her, "they are aspects of the one."

The deputy clerk referred Simpson's request to the County Attorney, who stated to Simpson and her attorneys that she was not eligible to be added to the list. He observed that "Chesterfield's non-sectarian invocations are traditionally made to a divinity that is consistent with the Judeo-Christian tradition," a divinity that would not be invoked by practitioners of witchcraft.

The first letter that Simpson's attorney sent to the County, meanwhile, pointed out the constitutional tension in denying witches the opportunity to lead an invocation. She then suggested a solution: "This is easily — and constitutionally — accomplished by eliminating prayer as part of the meetings. If, however, the Board insists on having prayers," it could not exclude Simpson.

Spurred to review its policy by Simpson's repeated requests — the first time the policy had ever been challenged — the County Board affirmed it. After it became clear that the County would not recon-

_____

practice her religion. The County also suggests that she lacks standing because her proposed invocation would not, as she acknowledges, "invoke" a deity's guidance, but would be more akin to inspirational, welcoming remarks. We agree with the magistrate judge that Simpson's exclusion from the list of those eligible to give an invocation is an injury sufficient to satisfy standing requirements. *See Simpson*, 292 F. Supp. 2d at 809.

sider or make an exception for Simpson, she brought suit in the U.S. District Court for the Eastern District of Virginia. She alleged that her exclusion from the list amounted to a violation of the Establishment Clause in that the County's policy impermissibly advanced Judeo-Christian religions. She also argued that the policy violated her rights under the Free Exercise and Free Speech Clauses of the First Amendment, as well as the Equal Protection Clause of the Fourteenth Amendment.

The district court, on cross motions for summary judgment, granted Simpson's motion as to the Establishment Clause claim, finding that the County had engaged in impermissible denominational preference. It simultaneously granted the County's motion as to the remaining allegations. *Simpson*, 292 F. Supp. 2d at 823. Both parties have appealed, and we consider the issues de novo. *See Canal Ins. Co. v. Distribution Servs., Inc.*, 320 F.3d 488, 491 (4th Cir. 2003).

II.

The parties here differ as to which lines of precedent govern this case. Simpson rejects the County's argument that the principles of *Marsh v. Chambers* suffice to resolve the dispute. She instead offers, and the district court accepted, *Larson v. Valente*, 456 U.S. 228 (1982) (finding "denominational preference" to violate the Establishment Clause), as well as *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971) (creating a general framework to evaluate Establishment Clause challenges). We think her reliance on these cases is misplaced and conclude that *Marsh v. Chambers* controls the outcome of this case.

First, *Marsh* deals directly with legislative invocations, the specific issue before us. *Marsh* defines legislative prayer as an act to "invoke Divine guidance on a public body entrusted with making the laws . . . ." *Marsh*, 463 U.S. at 792. The County's invocations have been explicitly tied to this notion since their inception in 1984.

Second, *Marsh* was decided after both *Lemon* and *Larson*, and it declined to apply either of them. *Marsh* mentioned *Lemon* only once, and then only to note that the court of appeals, which the Supreme Court reversed, had relied on it. *Id.* at 786. The Court's failure to

apply this well-known precedent suggests that *Lemon* was not the proper lens through which to view this particular dispute. *Larson*, meanwhile, was not even referenced, despite being a particularly fresh precedent, decided barely a year before *Marsh* itself. Even though *Marsh* considered the question of clergy selection, which Simpson claims is governed by *Larson*, the Court found *Larson*'s denominational preference test no more dispositive than it found *Lemon*.

*Marsh*'s refusal to adopt the framework of *Lemon* or *Larson* could not have been inadvertent. This impression is confirmed by the dissent's heavy reliance on both cases, and its frustration that the Court had refused to acknowledge their relevance. The dissent quite accurately observed that "[t]he Court makes no pretense of subjecting Nebraska's practice of legislative prayer to any of the formal 'tests' that have traditionally structured our inquiry under the Establishment Clause," *id.* at 796 (Brennan, J., dissenting), and asserted that "the Nebraska practice, at least, would fail the *Larson* test." *Id.* at 801 n.11 (Brennan, J., dissenting). The dissent added that "if any group of law students were asked to apply the principles of *Lemon* to the question of legislative prayer, they would nearly unanimously find the practice to be unconstitutional." *Id.* at 800-01 (Brennan, J., dissenting).

We are of course governed not by the dissent, but by the majority. Thus we must follow the rubric announced in *Marsh* itself, and not the tests it rejected, in the limited context of legislative prayer. We do not disrespect *Lemon* or *Larson* by so doing. We simply recognize that their guidance, though generally applicable to Establishment Clause disputes, does not extend to the present controversy. The Court itself recognized as much, stating that in *Marsh* it "did not even apply the *Lemon* 'test.'" *Lynch v. Donnelly*, 465 U.S. 668, 679 (1984). *See also Edwards v. Aguillard*, 482 U.S. 578, 583 n.4 (1987) (noting that *Marsh* had not applied the *Lemon* test). *Marsh*, in short, has made legislative prayer a field of Establishment Clause jurisprudence with its own set of boundaries and guidelines. We therefore agree with the Tenth Circuit, considering a similar challenge to a legislative prayer policy, that "the mainline body of Establishment Clause case law provides little guidance for our decision in this case. Our decision, instead, depends on our interpretation of the holding in *Marsh*." *Sny-*

*der v. Murray City Corp.*, 159 F.3d 1227, 1232 (10th Cir. 1998) (en banc).[3]

Third, applying *Marsh* here follows this circuit's case law. The magistrate judge, during oral argument, remarked that "[s]everal courts, including our own Fourth Circuit, want to escape somewhat of *Marsh*." This is incorrect. Fourth Circuit case law demonstrates not an intent to escape *Marsh* but a determination to apply it as the Supreme Court has directed. Most recently, our decision in *Wynne v. Town of Great Falls*, 376 F.3d 292 (4th Cir. 2004), found a Town Council's practice explicitly advancing exclusively Christian themes to be unconstitutional. *Wynne* reached this conclusion by applying *Marsh*, unequivocally signaling thereby that *Marsh* provided the appropriate rubric for questions of this sort.

Moreover, even when we have declined to apply *Marsh*, we have done so in a way that clearly indicates its appropriate application to the present case. For instance, in *North Carolina Civil Liberties Union Legal Foundation v. Constangy*, 947 F.3d 1145, 1148 (4th Cir. 1991), we declined to apply *Marsh* for the simple reason that judges praying from the bench did not fit within the ambit of the Court's discussion of *legislative* prayer. Likewise, *Mellen v. Bunting*, 327 F.3d 355, 370 (4th Cir. 2003), did not apply *Marsh* because "the supper prayer [at a state-sponsored university] does not share *Marsh*'s 'unique history.'"

In short, this case squarely presents questions concerning legislative prayer. To ignore *Marsh*, when the Supreme Court explicitly tied

---

[3]Simpson claims that the Court modified *Marsh* in *County of Allegheny v. American Civil Liberties Union*, 492 U.S. 573 (1989). We recognize, as the court did in *Wynne*, that *Allegheny*'s language was "carefully considered" and "must be treated as authoritative." *Wynne*, 376 F.3d at 298 n.3 (internal quotation omitted). That language, however, does not operate to invalidate the County's policy, because that policy does "not demonstrate a preference for one particular sect or creed." *Allegheny*, 492 U.S. at 605. *Allegheny* concerned religious holiday displays, referencing *Marsh* to confirm that *Marsh* did not apply in that context. Nothing in *Allegheny* suggests that it supplants *Marsh* in the area of legislative prayer.

*Marsh* to the domain of legislative prayer, would be to ignore the Supreme Court's own directions. We therefore proceed to apply the principles of *Marsh* to the questions presented in this case. We shall first address the prayers themselves and then take up the aspect of the County's policy governing clergy selection.

### III.

### A.

Based on the long history of legislative prayer in Congress, *Marsh* concluded that non-sectarian legislative prayer generally does not violate the Establishment Clause. *Marsh*, 463 U.S. at 793-95. Although Simpson aims much of her challenge at the selection of clergy, the invocations themselves, as part and parcel of the unitary policy under attack, warrant our examination because they are what the general public sees and hears. In other words, "[w]hat matters under *Marsh* is whether the prayer to be offered fits within the genre of legislative invocational prayer that 'has become part of the fabric of our society' . . . ." *Snyder*, 159 F.3d at 1233 (quoting *Marsh*, 463 U.S. at 792). As *Marsh* teaches, legislative invocations perform the venerable function of seeking divine guidance for the legislature. As such, these invocations constitute "a tolerable acknowledgment of beliefs widely held among the people of this country," being as we are "'a religious people whose institutions presuppose a Supreme Being.'" *Marsh*, 463 U.S. at 792 (quoting *Zorach v. Clauson*, 343 U.S. 306, 313 (1952)). The Court also recognized that legislative invocations comport with the Establishment Clause not only because that tradition is ancient, but because invocations are intended to harmonize broadly "'with the tenets of some or all religions.'" *Id.* (quoting *McGowan v. Maryland*, 366 U.S. 420, 442 (1961)). Legislative invocations thus belong among "[t]hose government acknowledgments of religion [that] serve, in the only ways reasonably possible in our culture, the legitimate secular purposes of solemnizing public occasions, expressing confidence in the future, and encouraging the recognition of what is worthy of appreciation in society." *Lynch*, 465 U.S. at 693 (O'Connor, J., concurring).

Additionally, it mattered in *Marsh* that the audience during legislative invocations consists of "adult[s], presumably not readily suscepti-

ble to religious indoctrination or peer pressure." *Marsh*, 463 U.S. at 792 (internal quotations and citations omitted). This contrasts greatly with the Court's concern with, for instance, school children. *See, e.g.*, *Lee v. Weisman*, 505 U.S. 577, 596-97 (1992) (comparing the "atmosphere at the opening of a session of a state legislature where adults are free to enter and leave" with public school functions like graduations). *See also School Dist. of Abington Tp. v. Schempp*, 374 U.S. 203 (1963); *Engel v. Vitale*, 370 U.S. 421 (1962).

*Marsh* also considered, and found constitutionally acceptable, the fact that the prayers in question fit broadly within "the Judeo-Christian tradition." *Marsh*, 463 U.S. at 793. The Supreme Court pointedly declined to discount the prospect that such prayer can aid public bodies in the performance of their duties. *Id.* at 792. Instead, it recognized the capacity of legislative invocations to bring the unifying aspects of our heritage to the difficult task of public deliberation. *See, e.g.*, *id.* at 786, 791. Simpson's position would essentially repeal this understanding.

### B.

In recognizing the value of invocations, *Marsh* did not suggest that there are no limits on the practice of legislative prayer. Rather, the Court stated that a practice would remain constitutionally unremarkable where "there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief." *Id.* at 794-95.

Our recent decision in *Wynne* is illustrative. In *Wynne*, sectarian references in invocations were far more than occasional or incidental. Even a perfunctory reading of the prayers reveals their pervasively and exclusively sectarian nature. In Great Falls, "the Town Council insisted upon invoking the name 'Jesus Christ'" in an exclusive manner in prayer "in which the Town's citizens participated." *Wynne*, 376 F.3d at 301 & n.7. Town leaders made plain that they intended to begin meetings with elements of what can only be described as Christian worship. *See id.* at 295 (quoting the mayor as stating that "[t]his is the way we've always done things and we're not going to change").

In finding this practice unconstitutional, the court held that *Marsh* precluded local legislatures from improperly exploiting "a 'prayer

opportunity' to 'advance' one religion over others." *Id.* at 298 (quoting *Marsh*, 463 U.S. at 794). *Wynne* was concerned that repeated invocation of the tenets of a single faith undermined our commitment to participation by persons of all faiths in public life. For ours is a diverse nation not only in matters of secular viewpoint but also in matters of religious adherence. Advancing one specific creed at the outset of each public meeting runs counter to the credo of American pluralism and discourages the diverse views on which our democracy depends.

The facts of *Wynne*, however, contrast sharply with those in the present case. The insistent sectarianism of the Great Falls prayers, *see id.* at 294-96 & n.2, violated even the spacious boundaries set forth in *Marsh*. Chesterfield's policy, adopted in the immediate aftermath of *Marsh*, echoes rather than exceeds *Marsh*'s teachings. The County never insisted on the invocation of Jesus Christ by name, as the Town Council in Great Falls did. *Id.* at 301. In fact, Chesterfield has aspired to non-sectarianism and requested that invocations refrain from using Christ's name or, for that matter, any denominational appeal.

Reflecting the effort to include diverse creeds, Chesterfield has had a wide variety of prayers, the richness of which is quite revealing. Clerics from multiple faiths and traditions have described divinity in wide and embracive terms — "Lord God, our creator," "giver and sustainer of life," "the God of Abraham, Isaac and Jacob," "the God of Abraham, of Moses, Jesus, and Mohammad," "Heavenly Father," "Lord our Governor," "mighty God," "Lord of Lords, King of Kings, creator of planet Earth and the universe and our own creator." Chesterfield's openness to this ecumenism is consonant with our character both as a nation of faith and as a country of free religious exercise and broad religious tolerance.

Moreover, Chesterfield, unlike Great Falls, did not invite the citizenry at large to participate during its invocations. Board members made clear in depositions that the invocation "is a blessing . . . for the benefit of the board," rather than for the individual leading the invocation or for those who might also be present. In other words, Chesterfield's invocations are "directed only at the legislators themselves," as the court in *Wynne* explained that they should be. *Id.* at 302.

Bearing in mind the differences between Chesterfield's practices and those found wanting in *Wynne*, it is hard to fault the Board for its attempt to foster inclusiveness in invocations. Understood in this manner, Chesterfield's invocation policy embodies the principle that religious expression can promote common bonds through solemnizing rituals, without producing the divisiveness the Establishment Clause seeks rightly to avoid. We therefore conclude that the content of the invocations given at County Board meetings has not "crossed the constitutional line." *Id.* at 298. Rather, the restraints made plain in the Board's policy and respected by those who lead invocations ensure that the prayers do not "proselytize or advance any one, or [ ] disparage any other, faith or belief," *Marsh*, 463 U.S. at 794-95, and therefore are constitutionally sound.

IV.

A.

Simpson argues that even if the invocations themselves are not objectionable, the selection process for those who lead them is. More specifically, she objects to her own exclusion as a potential prayer-giver. Her inability to participate follows from the County's policy, which allows only monotheistic congregations to add their religious leaders to the list of those eligible to give an invocation.

We again apply the principles announced in *Marsh*. In that case, the Supreme Court considered the chaplaincy of the Nebraska legislature, a position with a state-paid salary which for some sixteen years had been held by a single Presbyterian minister. The Court had no concerns with the public funding, which was "grounded in historic practice initiated . . . by the same Congress that drafted the Establishment Clause of the First Amendment." *Id.* at 794.

Nor was the Court persuaded that the selection of the minister from one denomination, to the exclusion of other clerics, made a constitutional difference. So long as the annual retention of a chaplain did not "ste[m] from an impermissible motive," then "his long tenure does not in itself conflict with the Establishment Clause." *Id.* at 793-94. Indicating the latitude retained by legislatures, however, the Court did not remand for a determination as to whether there had been such an "im-

permissible motive." Instead it simply noted that the Nebraska legislature had not strayed beyond permissible bounds.

In upholding the practice at issue in *Marsh*, the Court relied heavily upon congressional precedent. It noted that only three days after authorizing paid chaplains for each House of Congress, that same First Congress agreed on the final form of the Bill of Rights. *Id.* at 788. "[T]he practice of opening sessions with prayer has continued without interruption ever since that early session of Congress." *Id. Marsh* also indicated that acceptable practice was not limited to the selection of a single minister, as Nebraska had done. In fact, Congress's own method of selecting the prayer giver has not remained constant. *Marsh* noted that although Congress has usually appointed its chaplains, like the Nebraska legislature, it for some time "abandoned th[at] practice . . . in favor of inviting local clergy to officiate." *Id.* at 789 n.10 (citing Cong. Globe, 35th Cong., 1st Sess. 14, 27-28 (1857)). This latter system, also part of what the Court saw as a practice "continu[ing] without interruption" since the First Congress, *id.* at 788, mirrors the system adopted by Chesterfield County.

In noting the Presbyterian identity of the chaplain in *Marsh*, the Court recognized the reality that *any* choice of minister would reflect, if not denominational preference, then at least denominational awareness. *Id.* at 793. A chaplain by definition is a member of one denomination or faith. Yet this did not cause the Court in *Marsh* to void the practice of the Nebraska legislature. A party challenging a legislative invocation practice cannot, therefore, rely on the mere fact that the selecting authority chose a representative of a particular faith, because some adherent or representative of some faith will invariably give the invocation.

## B.

The principles set forth in *Marsh* work to sustain the County's clergy selection policy. The fact that Chesterfield's invocations are not given by a single, paid chaplain does not deprive the County of *Marsh*'s protection. Indeed, the selection aspect of the practice here is in many ways more inclusive than that approved by the *Marsh* Court. Ministers in Chesterfield, unlike in *Marsh*, are not paid with public funds. In contrast to *Marsh*'s single Presbyterian clergyman,

the County welcomes rabbis, imams, priests, pastors, and ministers. Chesterfield not only sought but achieved diversity. Its first-come, first-serve system led to prayers being given by a wide cross-section of the County's religious leaders.[4]

Moreover, any particular cleric who leads an invocation in Chesterfield is self-selected. The Nebraska legislature chose its chaplain itself, but the Chesterfield Board does not even know the names of clerics, since invitations are sent to congregations, addressed only to the "religious leader." The County has no ability to dictate selection; the clergy itself controls it by choosing to respond or not.

Simpson regards the County's inclusiveness as a negative, because in moving beyond *Marsh*'s approval of a single Presbyterian minister,

---

[4]Simpson nonetheless complains that the cross-section of religious leaders failed to include her. She says the County's refusal to allow her to lead an invocation was not due solely to the fact that she was an acknowledged pantheist. She notes that one County Board member was quoted in the press as stating, "It is a mockery. It is not any religion I would subscribe to." A second Board member was quoted in an October 5, 2002, article as saying, "I hope she's a good witch like Glenda," and "There is always Halloween." This Board member later explained that she made these comments immediately after returning to the Board after two months of maternity leave. During her leave, she had been targeted by the "World Church of the Creator about being a woman in office." At this point, during the commotion of returning to work as a Board member, another member of the Board briefly mentioned to her that a constituent who was a witch had requested permission to lead an invocation. Without then knowing who Simpson was or even what Wicca was, she was contacted by a journalist less than a day later and gave the flippant responses noted above. In her deposition, the Board member acknowledged that those statements "were not respectful of Wiccans" and explained that her jesting reference to Halloween came simply because the month of October — when the interview occurred — makes such images readily available.

Such statements, even if they were off the cuff and made in jest, undermine the respect that is due to any citizen. On the other hand, such ill-advised remarks do not override the fact that the County seriously considered Simpson's request and, as described at length herein, adopted an indisputably broad and inclusive legislative invocation practice.

the County has not also chosen to go beyond the monotheistic tradition. But neither *Marsh* nor our case law bars this approach in the legislative invocation context. The plaintiff in *Wynne*, for instance, did not challenge the prayer-giver, even though she knew that her request — to substitute numerous references to "Jesus Christ" with something general, like "God," *see Wynne*, 376 F.3d at 296 — would still allow prayers to be given by the same representatives who gave the sectarian prayers to which she had objected.

The Supreme Court, elaborating on the proscriptions in *Marsh*, has noted that

> in *Marsh* itself, the Court recognized that not even the 'unique history' of legislative prayer can justify contemporary legislative prayers that have the effect of affiliating the government with any one specific faith or belief. The legislative prayers involved in *Marsh* did not violate this principle because the particular chaplain had 'removed all references to Christ.'

*County of Allegheny v. Am. Civil Liberties Union*, 492 U.S. 573, 603 (1989) (internal citations omitted). The Court, neither in *Marsh* nor in *Allegheny*, held that the identity of the prayer-giver, rather than the content of the prayer, was what would "affiliat[e] the government with any one specific faith or belief." Chesterfield has likewise made plain that it was not affiliated with any one specific faith by opening its doors to a very wide pool of clergy. The Judeo-Christian tradition is, after all, not a single faith but an umbrella covering many faiths. We need not resolve the parties' dispute as to its precise extent, as Chesterfield County has spread it wide enough in this case to include Islam. For these efforts, the County should not be made the object of constitutional condemnation.

It would, of course, be possible for any court to pick fault with any elected body's selection of clergy. While deference under *Marsh* is not unlimited, too much judicial fine-tuning of legislative prayer policies risks unwarranted interference in the internal operations of a coordinate branch. The Chesterfield policy of clergy selection may not encompass as much as Simpson would like, and were it to be applied beyond the "unique" and limited context of legislative prayer,

*see Marsh*, 463 U.S. at 791, it may not encompass as much as *Larson* would require. But that context is all important, for if *Marsh* means anything, it is that the Establishment Clause does not scrutinize legislative invocations with the same rigor that it appraises other religious activities. At oral argument, counsel for Simpson tried to equate the selection of a cleric with the selection of a county assessor. It is unsurprising, however, that scrutiny of governmental actions outside the realm of legislative prayer, such as ordinary hiring practices for government jobs, might follow different standards. Chesterfield has followed the standards that control — those of *Marsh*.

### C.

Simpson's attempt to make the greater inclusiveness of the Chesterfield policy the very basis of its invalidation would achieve a particularly perverse result. For it would push localities intent on avoiding litigation to select only one minister from only one faith. We do not believe *Marsh* intended to mandate such exclusivity. It is true that Nebraska hired only one Presbyterian minister for sixteen years. But nothing in *Marsh* says that legislative or local governmental bodies must have a single minister or chaplain drawn from only one denomination. *Marsh*'s caution against "impermissible motives" does not fasten on local governments a *limitation* to a prayer-giver from one religious view. This would have the consequence of making America and its public events more insular and sectarian rather than less so.

In seeking to invalidate the Chesterfield system, Simpson effectively denies the ecumenical potential of legislative invocations, and ignores *Marsh*'s insight that ministers of any given faith can appeal beyond their own adherents. Indeed, *Marsh* requires that a divine appeal be wide-ranging, tying its legitimacy to common religious ground. *See Marsh*, 463 U.S. at 786, 792. Invocations across our country have been capable of transcending denominational boundaries and appealing broadly to the aspirations of all citizens. As *Marsh* and other cases recognize, appropriately ecumenical invocations can be "solemnizing occasions" that highlight "beliefs widely held." *See, e.g.*, *Elk Grove Unified Sch. Dist. v. Newdow*, 124 S. Ct. 2301, 2322 (2004) (O'Connor, J., concurring in judgment); *Allegheny*, 492 U.S.

at 625 (O'Connor, J., concurring in part); *Lynch*, 465 U.S. at 693 (O'Connor, J., concurring).

We cannot adopt a view of the tradition of legislative prayer that chops up American citizens on public occasions into representatives of one sect and one sect only, whether Christian, Jewish, or Wiccan. In private observances, the faithful surely choose to express the unique aspects of their creeds. But in their civic faith, Americans have reached more broadly. Our civic faith seeks guidance that is not the property of any sect. To ban all manifestations of this faith would needlessly transform and devitalize the very nature of our culture. When we gather as Americans, we do not abandon all expressions of religious faith. Instead, our expressions evoke common and inclusive themes and forswear, as Chesterfield has done, the forbidding character of sectarian invocations.

V.

Simpson also raised a challenge to the County's practice under the Free Exercise and Free Speech Clauses of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. We affirm the magistrate judge's grant of summary judgment to the County on these claims.

The district court correctly concluded that "the issue of whether [Simpson] has been denied her full, free, and equal right to express and exercise her religious beliefs is subject to a unitary analysis." *Simpson*, 292 F. Supp. 2d at 818 (citing *Columbia Union College v. Clarke*, 159 F.3d 151, 155 n.1 (4th Cir. 1998)). Correctly adhering to Supreme Court precedent, the district court also found that this issue turns on the characterization of the invocations as government speech:

> The avowed purpose of the invocation is simply that of a brief pronouncement of simple values presumably intended to solemnize the occasion. The invocation is not intended for the exchange of views or other public discourse. Nor is it intended for the exercise of one's religion . . . . The context, and to a degree, the content of the invocation segment is governed by established guidelines by which the Board

> may regulate the content of what is or is not expressed when it "enlists private entities to convey its own message."

*Simpson*, 292 F. Supp. 2d at 819 (internal citations omitted) (quoting *Rosenberger v. Rector*, 515 U.S. 819, 833 (1995)).

We therefore agree with the district court's determination that the speech in this case was government speech "subject only to the proscriptions of the Establishment Clause." *Id.* at 820. In light of our conclusion that none of the Establishment Clause's proscriptions were transgressed here, the standards for challenges to government speech, properly applied by the district court, require that Simpson's other claims must be rejected.

For these reasons, the judgment of the district court is affirmed in part, reversed in part, and remanded with directions to dismiss the complaint.

*AFFIRMED IN PART, REVERSED IN PART,*
*AND REMANDED WITH DIRECTIONS*

NIEMEYER, Circuit Judge, concurring:

I am pleased to join Judge Wilkinson's fine opinion. I write separately only to clarify an implicit argument in the opinion, *supra* at 12, which, if recognized explicitly, demonstrates conclusively the propriety of relying on *Marsh v. Chambers*, 463 U.S. 783, 793 (1983), to dispose of the case before us.

It is well-accepted that the analysis for scrutinizing the government's own speech under the First Amendment is different from and more relaxed than the analysis for scrutinizing government prohibitions or impositions of speech *on the people*. *See Bd. of Regents of the Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 229 (2000); *id.* at 235 ("Where the [State] University speaks, either in its own name through its regents or officers, or in myriad other ways through its diverse faculties, the analysis likely would be altogether different"). This is so because "when the State is the speaker, it may make content-based choices." *Rosenberger v. Rector & Visitors of Univ. of*

*Va.*, 515 U.S. 819, 833 (1995). Similarly, the analysis for scrutinizing the government's own prayer under the First Amendment is different from and more relaxed than the analysis for scrutinizing government prescriptions or proscriptions of prayer *for the people. See Allegheny Co. v. Greater Pittsburgh ACLU*, 492 U.S. 573, 603 n.52 (1989) ("Legislative prayer does not urge citizens to engage in religious practices, and on that basis could well be distinguishable from an exhortation from government *to the people* that they engage in religious conduct") (emphasis added). These distinctions flow from the structure of the Constitution itself, under which "We the People" insist on the prohibition of various governmental intrusions *on the people's* liberty.

Thus, when a governmental body engages in prayer for itself and does not impose that prayer *on the people*, the governmental body is given greater latitude than when the government imposes prayer *on the people*. When the "people" are involved, the Supreme Court has held that the Establishment Clause "guarantees that government may not coerce *anyone* to support or participate in religion or its exercise, or otherwise act in a way which establishes a state religion or religious faith, or tends to do so." *Lee v. Weisman*, 505 U.S. 577, 587 (1992) (emphasis added) (citations and internal quotation marks omitted). It is a cornerstone principle of our Establishment Clause jurisprudence that "it is no part of the business of government to compose official prayers *for any group of the American people* to recite as a part of a religious program carried on by government." *Engel v. Vitale*, 370 U.S. 421, 425 (1962) (emphasis added); *see also Weisman*, 505 U.S. at 589 ("The First Amendment's Religion Clauses mean that religious beliefs and religious expression are too precious to be either proscribed or prescribed by the State").

But when members of a governmental body participate in a prayer for themselves and do not impose it on or prescribe it for *the people*, the religious liberties secured *to the people* by the First Amendment are not *directly* implicated, and the distinct, more tolerant analysis articulated in *Marsh* governs. *Marsh* holds, as Judge Wilkinson ably articulates in his opinion for the court, that a governmental body may select and say nondenominational prayers for the purpose and benefit *of that body* so long as the prayers do not "proselytize or advance any one, or . . . disparage any other, faith or belief." 463 U.S. at 794-95;

*cf. Rust v. Sullivan*, 500 U.S. 173, 192-200 (1991) (holding that the government may control the content of its speech).

Ever since *Marsh*, the Supreme Court has continued to recognize the distinction between prayer engaged in by the government for itself and prayer imposed on the people, subjecting the latter form of prayer to heightened scrutiny. In *Allegheny County v. Greater Pittsburgh ACLU*, for example, the Court explicitly relied on this distinction:

> It is worth noting that just because *Marsh* sustained the validity of legislative prayer, it does not necessarily follow that practices like proclaiming a National Day of Prayer are constitutional. *Legislative prayer does not urge citizens to engage in religious practices, and on that basis could well be distinguishable from the exhortation from government to the people that they engage in religious conduct.*

492 U.S. at 603 n.52 (emphasis added) (citation omitted).

Our recent decisions in *Mellen v. Bunting*, 327 F.3d 355 (4th Cir. 2003), and *Wynne v. Town of Great Falls*, 376 F.3d 292 (4th Cir. 2004), are fully consistent with the distinction made between legislative prayer and prayer *for the people*. In *Mellen*, we struck down a prayer said at evening meals at the Virginia Military Institute, a state college, when the prayer was composed and sponsored by state officials for "the people," i.e. the students during the meal hour. 327 F.3d at 375. And in *Wynne*, we struck down a uniquely Christian legislative prayer designed for and participated in *by the people*. 376 F.3d at 302. In response to the Town Council's argument in *Wynne* that its prayer should be approved under *Marsh* because it was given for the Town Council, not the people, we said:

> The Town Council briefly contends that the prayers at issue here were "only and for the benefit of the Council members." Given the record evidence and unchallenged factual findings of the district court, that contention is simply untenable. The district court found that the Town Council specifically listed the prayers first on its agenda of public business and that citizens customarily participated in the prayers by standing and bowing their heads. Indeed, citizens actively

joined in the prayers by declaring "amen" and sometimes "hallelujah" at the conclusion. . . . Finally in its June 2003 Resolution, the Town Council stated that the "invocation may request divine guidance for the *Town of Great Falls and its . . . citizens*," (emphasis added), and so itself has recognized that the town's prayers are not just for council members but for all of the Town's citizens. *Thus, in a very real sense, the Town Council has directed Christian prayers at — and thereby advanced Christianity to — the citizens in attendance at its meetings and the citizenry at large.*

*Wynne*, 376 F.3d at 301 n.7 (second emphasis added) (citations omitted).

The undisputed evidence in the case before us readily distinguishes this case from *Wynne* because the Chesterfield County Board of Supervisors engages in prayer for itself and *not for the people*. As one of the supervisors testified:

The purpose of an invocation is for the board members to invoke God's blessing upon our organization, upon our meetings, and that is my understanding as to what the board's purpose is, is *to serve the board*, not the individual.

\*       \*       \*

[I]t's to have God's blessing invoked on sometimes very contentious hearings. *It's for our benefit.*

(Emphasis added).

And this is precisely the type of prayer considered and upheld against an Establishment Clause challenge in *Marsh*. *See* 463 U.S. at 792 (pointing out that the prayer there was "[t]o invoke Divine guidance on a public body entrusted with making the laws"). Because the prayers received and used by the Chesterfield County Board of Supervisors were for the Board alone — to invoke God's blessing upon that organization — under *Marsh*, the Board's selection and use of prayer did not amount to "an 'establishment' of religion or a step toward establishment." *Id.*